United States District Court
Southern District of Texas

**ENTERED**

July 30, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALCLAIR WHITE, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-187 |
| | § | |
| CHEVRON PHILLIPS | § | |
| CHEMICAL CO., LP, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Alclair White had worked for Chevron Phillips Chemical—known as CPChem—and its predecessor company for 36 years when she was fired in May 2016.  White, a 60-year-old African-American woman who suffered from hepatitis C and lipidemia, alleges that CPChem discriminated against her on the basis of race, sex, age, and disability, CPChem failed to accommodate her disability, and CPChem retaliated against her after she complained to the company's human resources department, filed a charge with the U.S. Equal Employment Opportunity Commission, and applied for leave under the Family and Medical Leave Act.  (Docket Entry No. 11 at ¶¶ 44–70; Docket Entry Nos. 43-20, 43-24, 43-25).  CPChem responds that it suspended and later fired White after the human resources department concluded that she had sexually harassed a contractor employee and later disclosed confidential staffing information to another contractor employee.  (Docket Entry No. 43 at 12–13, 18–20, 33; Docket Entry Nos. 43-8, 43-9, 43-10, 43-13, 43-14, 14-15).

After discovery, CPChem moved for summary judgment, White responded, and CPChem replied.  (Docket Entry Nos. 43, 45, 47).  CPChem also moved to strike certain evidence that White

submitted with her summary judgment response brief, White responded, and CPChem replied. (Docket Entry Nos. 46, 48, 49).

Based on a careful review of the record, the parties' arguments, and the applicable law, the court grants in part and denies in part the motion to strike and grants CPChem's motion for summary judgment. An order of final judgment is separately entered. The reasons for these rulings are set out in detail below.

## I.    Background

In 1980, Alclair White began working for Philips 66 Chemical, CPChem's predecessor, as a mail and stockroom clerk. (Docket Entry No. 11 at ¶ 12; Docket Entry No. 43 at 10). She worked for Phillips Petroleum and then CPChem until she was fired in 2016. White states that she has suffered from hepatitis C and lipidemia, which limited her physical strength and mobility. (Docket Entry No. 45-12, White Dep. at 33:15–38:14).

In November 2011, CPChem promoted White to the newly created position of materials coordinator. (Docket Entry No. 11 at ¶ 13; Docket Entry No. 43 at 11; Docket Entry No. 45-1 at 2). The job involved working closely with third-party contract employees that CPChem hired through the Zachry Construction Group. (Docket Entry No. 43 at 11; Docket Entry No. 43-17, White Dep. at 43:23–44:7; Docket Entry No. 43-18 at 2). These contractors reported to supervisor Barry Nichols, a Zachry Construction employee. (Docket Entry No. 43-17, White Dep. at 44:4–16). Until August 2015, White reported to CPChem employee Robby Davis, and then to Eugene Velasquez, who took over for Davis. (*Id.* at 47:20–48:3). Neither supervisor gave White a negative performance review, and White received regular raises during her employment. (*Id.* at White Dep. at 74:12-14, 103:11–21, 156:7-10; Docket Entry No. 43 at 11, 14).

A chronology of the events disclosed by the summary judgment record is helpful.

- **December 2014**

CPChem suspended White for two days for sexual harassment and retaliation and issued her a "final written warning." (Docket Entry No. 43 at 12–13; Docket Entry No. 43-10). This occurred after Virginia Hubbard and Adam Sainato, two human resources employees, investigated an anonymous complaint about White's behavior. (Docket Entry Nos. 43-8, 43-9). Hubbard and Sainato interviewed White and five other employees before concluding that White had kissed a contractor employee "on the cheek," and that this was a form of sexual harassment. (*Id.*; Docket Entry No. 43-10). Hubbard and Sainato also found that White retaliated against Magali Villalpando—another contractor employee, who White suspected was the source of the anonymous complaint—and that White violated confidentiality by discussing the investigation with others. (*Id.*). White admitted that she kissed the contractor employee, though she disputed the investigation's other findings and claimed that the process was unfair. (Docket Entry No. 43-17, White Dep. at 55:16–57:17; Docket Entry No. 45-7).

- **March 2015**

Three months after the final written warning, in March 2015, White filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Docket Entry No. 43-20). The charge alleged that: White's supervisor, Davis, "submitted [White's performance review] without allowing [her] to make any comments"; Villalpando had replaced White on Davis's team; White disagreed with the 2014 investigation conclusions and had tried to correct these by contacting Davis and Hubbard; another employee called her an "aggressive black woman" in a conversation with Davis; a third-party vendor employee addressed White with a racial slur; Bubba McArthur, another employee at CPChem's Pasadena facility, spoke rudely to White; White felt excluded from meetings that white men attended; McArthur was paid "a significant amount more

than [White]" even though they do the same job; and White felt like she "[was] placed under a microscope."  (Docket Entry No. 43-20 at 2–4).

White alleges that, after she filed her EEOC complaint, "CPChem began to target and nitpick various things that [she] did."  (Docket Entry No. 45-1 at ¶ 4).  "Things began to change, and [White] felt that CPChem began to harass [her], and did not give [her] the quality of help [she] needed to be successful."  (*Id.*).

- **April 2015**

In April 2015, CPChem stopped including White in the Voluntary Protection Program, a "highly respected" extracurricular safety initiative, after she missed a February 2015 meeting. (Docket Entry No. 11 at ¶ 17; Docket Entry No. 45-10).  White alleges that she had received gifts and bonuses for participating the Program and that she had been the only African American on the team.  (Docket Entry No. 11 at ¶ 17; Docket Entry No. 45-12, White Dep. at 183:17–19).  She also states that human resources personnel failed to provide her with "valid reasons as to why [she] was removed."  (Docket Entry No. 45-1 at ¶ 6).

- **September 2015**

In September 2015, White told the human resources department that she heard she would be fired in April 2016, after an "outage."  (Docket Entry No. 45-4).[1]  White also began to have problems with her new supervisor, Velasquez.  White alleges that, by September, it seemed as if Velasquez's main job was "to get rid of [White] by saying things or doing things.  He made it very difficult."  (Docket Entry No. 45-12, White Dep. at 101:13–16).  White has testified that Velasquez would "side-track" her, would not speak to her or keep her informed about work matters, and "only

---

[1] White alleges that the human resources department failed to follow up or investigate, but she does not cite supporting summary judgment evidence.  (Docket Entry No. 45 at 14).

communicated" with contractor Magali Villalpando.[2]  (*Id.* at 101:19–102:8, 148:23–149:6).  On the other hand, White admitted that Velasquez did not reprimand her and she could not recall when he stopped her from performing any job tasks.  (*Id.* at 102:14–20, 149:10–15; Docket Entry No. 43-17, White Dep. at 103:5–21).

- **October 2015**

White alleges that in October 2015, CPChem denied her request for a 35-year service award without "any [] explanation" from Sainato and Lisa Laurin at human resources aside from that "[the award] was blocked" and "she waited too [long]."  (Docket Entry No. 11 at ¶ 28; *see* Docket Entry No. 43-11).  White does not question the authenticity of the human resources department email CPChem produced, in which Lisa Laurin offered to order White's service award even though she had missed the deadline to select one.  (Docket Entry No. 43-11 at 2).

- **November 2015**

CPChem acknowledges that Velasquez took White off a "rental project" in November 2015, but emphasizes White's admission that this decision did not impact her job title, primary responsibilities, or salary.  (*See* Docket Entry No. 11 at ¶ 29; Docket Entry No. 43-17, White Dep. at 122:7–25).  White testified that she did not interpret Velasquez's decision as a signal that he thought she was not doing her job.  (*Id.*).  She agreed that one of his reasons was his desire that she focus on her primary duties in materials coordination.  (*Id.*).  In November 2015, White submitted a Family and Medical Leave Act request to CPChem's Leave Administration Unit, but the unit denied the request because of missing documents.  (Docket Entry No. 43-24).

---

[2] White does not point to summary judgment evidence that supports some of her amended complaint's allegations against Velasquez.  For example, the complaint states that Velasquez "showed an e-mail to all the planners of his group . . . stating 'Ms. White is not doing her job,'" and that "[f]rom 2015 on, all of [White]'s responsibilities were ripped away from her."  (Docket Entry No. 11 at ¶¶ 21, 22).  The complaint also states that in November 2015, Velasquez, "took [White] to the Safety/Medical office and he questioned . . . her ability to work."  (*Id.* at ¶ 32).  No summary judgment evidence bears on these allegations.

In her amended complaint, White alleges that she filed over eight grievances with management and human resources "from April 2015 to January 2016." (Docket Entry No. 11 at ¶ 30). The amended complaint alleges that, despite "voic[ing] her concerns to Human Resources" White "did not get the support or back up" she sought and "[CPChem] did not address any [of her complaints]." (*Id.* at ¶¶ 26, 30).

White's amended complaint alleges that other acts of discrimination and retaliation occurred, but she does not identify dates, details, or the specific individuals involved. Among other things, these allegations include that she "was denied vacation, because they granted it to another employee instead"; she "was completely left out of day-to-day decisions"; "management stripped responsibilities from her to the point that she was required to get 'management approval' before completing any task"; "[she] was not given any help on various projects"; and she "was told she was not doing her job." (*Id.* at ¶¶ 18, 21, 23, 31). White testified in her deposition that some individuals, including a contractor named Mark, used racial slurs in her presence. (Docket Entry No. 45-12, White Dep. at 87:20–25, 149:16–25). She agreed Mark did not use slurs in front of her after her supervisor said he would not tolerate that behavior. (Docket Entry No. 43-17, White Dep. at 88:12–16). White also testified that unspecified individuals took "issue" with White performing tasks that were reserved for union employees, even though male Caucasian non-union employees performed the same duties without objection from the union. (Docket Entry No. 45-12, White Dep. at 147:13–23).

- **April and May 2016**

While White was suspended in April 2016, she submitted a second FMLA leave request. (Docket Entry No. 43-25). Again, the leave administration unit said no, citing missing documents.

6

(*Id.*; Docket Entry No. 43-24).  White argues that the unit should not have denied her second request.  (Docket Entry No. 45 at 14–15).

In April 2016, CPChem needed to reduce the number of contractors it employed.  (Docket Entry No. 43 at 18; Docket Entry No. 43-15).  Velasquez emailed White asking for her confidential input on two Zachry Construction contractors, Villalpando and Allen, with whom White had worked.  (*Id.*).  White testified that she called Velasquez and said she did not want to comment. (Docket Entry No. 45-12, White Dep. at 127:3–14).  Shortly after Velasquez's request, contractor Villalpando asked Zachry Construction supervisor Barry Nichols about her employment status. (Docket Entry Nos. 43-14, 43-18).  Nichols relayed this back to Velasquez, who asked the human resources department to investigate whether White "leaked" information that Villalpando might be fired.  (Docket Entry No. 43-18 at ¶ 10).  After concluding that White did disclose the confidential information, lied about doing so, and harassed Villalpando, Velasquez fired White in May 2016.  (*Id.* at ¶¶ 11–12).

- **February 2017**

In February 2017, White filed a second Equal Employment Opportunity Commission charge.  (Docket Entry No. 43-26).  In January 2019, she filed this lawsuit. (Docket Entry No. 1). White asserts nine employment discrimination and retaliation claims: (1) racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); (2) racial discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981; (3) sex discrimination under Title VII; (4) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621; (5) disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101; (6) retaliation under Title VII; (7) retaliation under the ADEA, 29 U.S.C. § 621; (8) retaliation under

the ADA, 42 U.S.C. § 12101; and (9) retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601.  (Docket Entry No. 11 at ¶¶ 44–70).

- **Summary**

The following timeline summarizes the key events:

- <u>December 2014</u>: CPChem human resources finds that White sexually harassed a contractor. (Docket Entry No. 43-9).

- <u>March 2015</u>: White filed an Equal Employment Opportunity Commission charge.  (Docket Entry No. 43-20).

- <u>April 2015</u>: CPChem stopped including White in the Voluntary Protection Program. (Docket Entry No. 43-23).

- <u>August 2015</u>: Velasquez became White's supervisor.  (Docket Entry No. 45 at 13).

- <u>September 2015</u>: White began to have problems with Velasquez and expressed concern to human resources that there was a plan to fire her in April 2016.  (*Id.* at 13–14).

- <u>November 2015</u>: CPChem's third-party FMLA leave administrator, University of Pittsburgh Medical Center Workpartners, denied White's FMLA leave request.  (Docket Entry No. 43-24).

- <u>April 2016</u>: Human resources investigated whether White disclosed confidential staffing information.  (Docket Entry No. 43-13).

- <u>April 2016</u>: White submitted another FMLA request.  (Docket Entry No. 43-25).  The FMLA leave administrator denied the request based on missing health care provider paperwork.  (*Id.*).

- <u>May 2016</u>:  CPChem fired White.  (Docket Entry No. 11 at ¶ 15).

8

After discovery, CPChem moved for summary judgment under Rules 37(c)(1) and 56(c)(4) on all claims, and White responded.  (Docket Entry Nos. 43, 45).  CPChem replied and moved to strike certain evidence in White's response to the summary judgment motion.  (Docket Entry Nos. 46, 47, 48, 49).  Each issue is examined below.

CPChem's summary judgment evidence includes the declaration of human resources employee Aprile Danford; CPChem policies; White's disciplinary records; excerpts from White's deposition; the declaration of White's supervisor, Eugene Velasquez; White's EEOC and FMLA documentation; and various emails.  (Docket Entry No. 43 at 8).

White submitted her affidavit; documents about a purported similarly situated employee, Bubba MacArthur; White's 2014 performance review; emails; a picture of the Volunteer Protection Program team; White's FMLA documentation; White's resumé; a document and emails concerning White's separation from CPChem; CPChem's Working Rules & Discipline Policy; and excerpts from White's deposition.  (Docket Entry No. 45 at 6).

The court considers the summary judgment evidence and the parties' arguments against the applicable legal standards.

## II.     The Legal Standards

### A.     The Motion to Strike

"The admissibility of evidence is governed by the same rules, whether at trial or on summary judgment."  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387–88 (5th Cir. 2009) (citation and quotation marks omitted).  Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4); *see Cutting Underwater Technologies USA, Inc. v. Eni*

*U.S. Operating Co.*, No. 09-387, 2011 U.S. Dist. LEXIS 29325, 2011 WL 1103679, at *10 (E.D. La. Mar. 22, 2011), *aff'd*, 671 F.3d 512 (5th Cir. 2012). "[A] nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (citing *S.W.S. Erectors., Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)); *see also Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n.23 (5th Cir. 1992) ("[A] nonmovant cannot defeat a summary judgment motion by submitting an affidavit which contradicts, without explanation, the nonmovant's previous testimony in an attempt to manufacture a disputed material fact issue."). "[A] statement that an affidavit is based on the affiant's personal belief does not automatically satisfy the requirement [of Rule 56(e)] that the affidavit be based on personal knowledge." *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (citation omitted). A party may challenge summary judgment evidence under Rule 56 by filing a motion to strike or by simply objecting to the evidence. *See Cutting Underwater Techs.*, 2011 U.S. Dist. LEXIS 29325, 2011 WL 1103679, at *10.

Under Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The Fifth Circuit instructs district courts to consider four factors to determine whether a Rule 26 violation is harmless: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 729 (5th Cir. 2010).

### B.    Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'"  *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case.  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).  "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response."  *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie*

*v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).   The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim.   *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).   "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."   *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted).   In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor."   *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).   But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### C.      Title VII, § 1981, ADEA, and ADA Claims

#### 1.      Discrimination

Courts analyze employment discrimination and retaliation claims under Title VII, 42 U.S.C. § 1981, the ADEA, and the ADA using the same framework.   *See, e.g.*, *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) ("In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis . . . ." (citation omitted)); *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013) ("The ADEA . . . prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age.   The familiar burden-shifting framework . . . applies to [this] statute[]." (citations

omitted)); *Dunaway v. Cowboys Nightlife, Inc.*, 436 F. App'x 386, 391–392 (5th Cir. 2011)

(applying the burden-shifting framework to a discrimination claim under 42 U.S.C. § 1981).

A plaintiff may use either direct or circumstantial evidence to prove discrimination. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).   Direct evidence proves the fact in question without inference or presumption.   *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).   When the only evidence is circumstantial, the court uses the *McDonnell Douglas* burden-shifting framework.   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   First, a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) others similarly situated but outside of the protected class experienced more favorable treatment.   *Id.*; *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005).   Once the plaintiff has shown these four elements, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged action. *McDonnell Douglas*, 411 U.S. at 802.

Under Title VII, 42 U.S.C. § 1981, the ADEA, and the ADA, the Fifth Circuit defines an adverse employment action as an "'ultimate employment decision' or its factual equivalent." *Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 396–97 (5th Cir. 2016) (discussing Title VII and § 1981 discrimination claims); *see also Austgen v. Allied Barton Sec. Servs., L.L.C.*, No. 19-20613, 2020 U.S. App. LEXIS 20085, 2020 WL 3493509, at *3 (5th Cir. June 26, 2020) (per curiam) (ADA claims); *Mitchell v. Snow*, 326 F. App'x 852, 854–55 (5th Cir. 2009) (ADEA claims).   Ultimate employment decisions include "hiring, granting leave, discharging, promoting, or compensating."   *Mitchell*, 326 F. App'x at 854 (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)).   "[A]llegations of unpleasant work meetings, verbal reprimands,

13

improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019) (quoting *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008)).

The Fifth Circuit interprets the comparator element strictly.  A plaintiff must show that her employer treated similarly situated employees more favorably in "nearly identical circumstances." *See Reed v. Brady Trucking, Inc.*, No. H-18-4437, 2019 U.S. Dist. LEXIS 44041, 2019 WL 1244100, at *11 (S.D. Tex. Mar. 18, 2019); *see also Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001) (alteration in original) (citation omitted) ("[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to [] [another] employee under nearly identical circumstances; that is, that the misconduct for which [the plaintiff] was discharged was nearly identical to that engaged in by . . . [other] employees."). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."  *Heggemeier v. Caldwell Cty., Tex.*, 826 F.3d 861, 868 (5th Cir. 2016) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)).

If the plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory explanation for its actions that is "legally sufficient to justify a judgment" in its favor. *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (quoting *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).  If the defendant does so, then the burden shifts back to the plaintiff to show either that the explanation is (1) a pretext for discrimination or (2)—under Title VII and the ADA, but not the ADEA or § 1981—that the explanation, while true, is only one factor in the employer's decision, and discrimination is another

"motivating factor." *Comcast Corp. v. NAACP*, 140 S. Ct. 1009, 1019 (2020) ("To prevail [under § 1981], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (Title VII motivating factor claims); *E.E.O.C.*, 773 F.3d at 702 (ADA motivating factor claims); *Ligon v. Lahood*, 614 F.3d 150, 157 n.3 (5th Cir. 2010) ("[T]he ADEA does not authorize a mixed-motive age discrimination claim . . . ." (citation omitted)).  The plaintiff has the ultimate burden of showing a genuine factual dispute material to determining whether the defendant discriminated on the basis of the plaintiff's membership in a protected class.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

### 2.      Failure to Accommodate a Disability under the ADA

To claim that an employer failed to accommodate a disability under the ADA, the employee must present evidence showing that (1) she was a qualified individual with a disability, (2) her employer was aware of her disability and its resulting limitations; and (3) the employer failed to reasonably accommodate her disability.  *Neely v. PSEG Tex. Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013).

### 3.      Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made [] unlawful . . . by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The legal analysis of retaliation claims under Title VII, the ADEA, the ADA, and the FLMA follows a burden-shifting framework that is similar to the discrimination claims.  *Wheat v. Fla. Parish*

15

*Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (Title VII and FMLA); *Heggemeier*, 826 F.3d at 869 (ADEA); *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (ADA).[3]

A plaintiff's *prima facie* retaliation claim elements are that (1) she engaged in a protected activity, (2) she was subject to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). In the retaliation context, the standard for an adverse employment action is more flexible than in the discrimination context. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning it could have dissuaded a reasonable employee from making a charge of discrimination. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). The adverse employment action must be objectively and materially harmful, beyond "petty slights or minor annoyances." *Id.*

"[T]o satisfy the 'causal link' requirement of a Title VII retaliation claim, the employee must provide substantial evidence that 'but for' exercising protected rights, she would not have been discharged." *Wheat*, 811 F.3d at 705 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). A plaintiff "may avoid summary judgment on 'but for' causation by demonstrating 'a conflict in substantial evidence on this ultimate issue.'" *Id.* at 710 (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012)). "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions." *Hernandez*, 670 F.3d at 660 (citation omitted). The but-for causation standard also applies to ADA and ADEA retaliation claims. *Lyons v. Katy Indep. Sch. Dist.*, No. 19-20293, 2020 U.S. App. LEXIS 20402, 2020 WL 3496855, at *4

---

[3] 42 U.S.C. § 1981 retaliation claims use the burden shifting framework as well, but White did not bring a retaliation claim under § 1981. *See Zastrow v. Hous. Auto Imps. Greenway Ltd.*, 789 F.3d 553, 564 (5th Cir. 2015).

(5th Cir. June 29, 2020) (ADA); *see also United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017) (per curiam) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)) (ADEA).  Yet "[n]either [the Fifth Circuit], nor the Supreme Court, has decided whether the heightened 'but for' causation standard . . . applies with equal force to FMLA retaliation claims." *Wheat*, 811 F.3d at 706.  Even when the but for standard applies, "[t]he burden of establishing 'causal link' in the prima facie case is much less onerous than the burden of proving 'but[]for' causation required for the determination of the ultimate issue of retaliation." *Kopszywa v. Home Depot U.S.A., Inc.*, No. 1:12-cv-394-HSO-RHW, 2014 U.S. Dist. LEXIS 15098, 2014 WL 5392297, at *12 (S.D. Miss. Oct. 22, 2014) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 n.8 (5th Cir. 1998), *superseded in part by statute*, ADA Amendments Act of 2008, § 2(b)(4)–(5), 122 Stat. 3553, 3558, *as recognized in Cruz v. R2Sonic, L.L.C.*, 405 F. Supp. 3d 676, 688 n.5 (W.D. Tex. 2019)).

If the plaintiff makes a *prima facie* showing, the defendant must then provide a "legitimate, non-retaliatory reason" for the adverse employment action.  *Rodriguez v. Brownsville Indep. Sch. Dist.*, 739 F. App'x 227, 231 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388–89 (5th Cir. 2007)).  If the defendant does so, the burden shifts back to the plaintiff to raise a material factual dispute as to whether the explanation is pretextual.  *Id.*

## III.    Analysis

### A.    The Motion To Strike

CPChem moves under Rule 56(c)(4) to strike parts of paragraphs 3, 4, and 6 of White's affidavit, (Docket Entry No. 45-1), for lack of personal knowledge.  (Docket Entry No. 46).

In White's affidavit, she states that Robby Davis failed to investigate White's allegation that Bubba MacArthur—another employee—made disrespectful comments towards her.  (Docket

Entry No. 45-1 at ¶ 3).  CPChem argues that White was not in a position to know whether there

was an investigation.  (Docket Entry No. 46 at 3–4).  Though White made the declaration under

oath, "[b]elief, no matter how sincere, is not equivalent to knowledge."  *Provident Life*, 274 F.3d

at 1000 n.79  (citation omitted).  "[T]o defeat a motion for summary judgment, the nonmoving

party must 'go beyond the pleadings and [] her own affidavits.'"  *Id.* at 991 (quoting *Celotex Corp.*,

477 U.S. at 324).  The court agrees that White was not in a position to personally know whether

Davis conducted an investigation, and strikes her statement to the contrary.

White also contends that she "was not the only person to miss a [Voluntary Protection

Program] team meeting," to show that it was unfair to remove her from the Program because she

missed a meeting.  (Docket Entry 45-1 at ¶ 6).  CPChem argues that White was not in a position

to know whether other members of the volunteer team had been absent but allowed to remain in

the program.  (Docket Entry No. 46 at 3–4).

The court declines to strike White's statement about meeting attendance.  As a former

member of the Volunteer Protection Program who had attended meetings, White could observe

when other members failed to show up.  That said, the court will not credit White's statement that

other Program members did not attend a specific meeting she also missed.  White does not cite

attendance records or witness statements, and for meeting she did not attend, she identifies no other

basis to know who was there.

The motion to strike part of paragraph 4 is denied.  White's affidavit asserts that

"[CPChem] began to target and nitpick various things that [White] did after [she] filed an EEOC

Charge in March 2015."  (Docket Entry No. 45-1 at ¶ 4).  This statement survives the motion to

strike because it is based on White's personal observations that "[CPChem] began to harass [her]

and did not give [her] the quality of help [she] needed to be successful."  (*Id.*).

CPChem moves under Rule 37(c)(1) to strike the photo of the Voluntary Protection Program team, (Docket Entry No. 45-5), and White's resumé, (Docket Entry No. 45-8), because White did not produce these documents during discovery.  (Docket Entry No. 46 at 4).  In White's response to the summary judgment motion, she appears to use the photograph to show the demographics of the Voluntary Protection Program.  (Docket Entry No. 45 at 12; Docket Entry No. 45-5).  White includes her resumé as evidence that she "was a qualified individual within her respective protected class."  (Docket Entry No. 45 at 20–21; Docket Entry No. 45-8).  CPChem has not asserted that White was unqualified.

The court denies the motion to strike the photo and resumé because their inclusion in the record is harmless under Rule 37(c)(1).  Considering these exhibits does not change the court's analysis of, or decision on, CPChem's motion for summary judgment.  The evidence is not critical and including it in the record does not prejudice CPChem.   *See Bailey*, 609 F.3d at 729 (when assessing harmlessness under Rule 37(c)(1), courts consider, among other factors, the importance of the evidence introduced in violation of Rule 26 and whether including the evidence in the record would prejudice the opposing party).

### B.    Whether Any of White's Claims Are Time-Barred

#### 1.    The Title VII, ADA, and ADEA Claims

The court must decide as a threshold issue whether, as CPChem argues, some of White's claims are time-barred.  In Texas, a plaintiff must file a claim with the EEOC within 300 days of the act that allegedly violates Title VII, the ADA, or the ADEA.  *Villarreal v. Mundy Cos.*, No. 03-41476, 2004 U.S. App. LEXIS 8606, 2004 WL 1331332, at *2 (5th Cir. Apr. 29, 2004) (collecting statutes and cases) ("To the extent that [the Texas plaintiff] alleges that his demotion violated Title VII, the ADA, or the ADEA, the district court properly found these claims to be time

barred.  An employee must file a charge with the EEOC within, at most, 300 days of an alleged

unlawful employment practice."); *Fontenot v. Dallas Indep. Sch. Dist*, No. 3-10-CV-0210-G, 2010

U.S. Dist. LEXIS 33373, 2010 WL 1286480, at *2 (N.D. Tex. Feb. 26, 2010) ("Under the federal

anti-discrimination statutes [i.e., Title VII, the ADA, and the ADEA], an aggrieved party must file

a charge of discrimination or retaliation with the EEOC within 300 days after the alleged unlawful

employment practice occurred.").  "[F]iling a timely charge of discrimination with the EEOC is

not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of

limitations, is subject to waiver, estoppel and equitable tolling."  *Taylor v. United Parcel Serv.,

Inc.*, 554 F.3d 510, 521 (5th Cir. 2008) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385,

393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)).

  To determine whether a claim is barred, the court needs to know (1) what the allegedly

unlawful employment practice was and (2) when this practice occurred.  *Nat'l R.R. Passenger

Corp. v. Morgan*, 536 U.S. 101, 110 (2002), *superseded in part by statute*, Lilly Ledbetter Fair Pay

Act, Pub. L. No. 111-2, 123 Stat. 5 (2009).  The Supreme Court has "repeatedly interpreted the

term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to

other acts."  *Id.* at 111.  "Discrete acts such as termination, failure to promote, denial of transfer,

or refusal to hire are easy to identify," and each of these discriminatory or retaliatory incidents is

"a separate actionable 'unlawful employment practice.'"  *Id.* at 114.  "A discrete retaliatory or

discriminatory act 'occur[s]' on the day that it 'happened.'"  *Id.* at 110; *see also Phillips v. Leggett

& Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011) ("[T]he limitations period begins on the date of

the alleged unlawful employment action.").

  White filed two EEOC charges: one on March 13, 2015, and the other on February 1, 2017.

(Docket Entry No. 11 at ¶¶ 10, 16).  Although this lawsuit arises from the 2017 EEOC filing, White

refers to the 2015 EEOC charge to explain CPChem's alleged retaliation.  (*Id.* at ¶¶ 16–17; Docket Entry No. 45 at 7 n.1, 18 n.17).  The parties agree that White's discrimination and retaliation claims arising from events on or after April 7, 2016, including White's May 2016 termination, are timely.  Because of the 300-day limit on time to file an EEOC charge, CPChem contends that "any acts occurring before April 7, 2016—300 days before [the] February 1, 2017 [EEOC filing]—are time barred."  (Docket Entry 43 at 22).

White invokes the continuing-violation doctrine, under which "a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts."  *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003).  White argues that CPChem's alleged misconduct from after the March 2015 EEOC filing but before April 7, 2016, was part of "an organized scheme leading to [White's] termination."  (Docket Entry No. 45 at 7, 18–20).  CPChem contends that the continuing-violation doctrine is "limited to hostile environment claims," and White agrees she has not alleged a hostile work environment.  (Docket Entry No. 45 at 7 n.1; Docket Entry No. 47 at 4);

In general, the continuing-violation doctrine does not apply outside the hostile work environment context.  *See Lee v. City of Corpus Christi*, 749 F. Supp. 2d 521, 531 (S.D. Tex. 2010).  "In *Nat.'l R.R. Passenger Corp. v. Morgan*, the [Supreme] Court held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004), *abrogated in part on other grounds by Burlington N.*, 548 U.S. at 68.  The *Morgan* Court did not address "pattern-or-practice" claims brought by private litigants, but those do not apply outside of class actions.  *See Morgan*, 536 U.S. at 115 n.9; *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) ("[T]he pattern-or-practice method of proving discrimination is unavailable in

a private, non-class action, such that [the plaintiff's] failure to bring this case as a class action or seek certification would also defeat his claim.").[4]

>    The Fifth Circuit applies the following limits to continuing-violation claims:
>
>    (1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."

*Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 738 (5th Cir. 2017) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)).  To determine whether separate acts are related, courts consider whether "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."  *Morgan*, 536 U.S. at 120–21; *see Heath*, 850 F.3d at 736–40 (focusing on those factors).

White has not made a persuasive case to apply the continuing-violation doctrine.  As explained further below, White alleges two adverse employment actions: her removal from the Voluntary Protection Program in April 2015, and her termination in May 2016.  (Docket Entry No. 45 at 21).  The former is outside the limitations period; the latter is not.  The two incidents happened a year apart and involved different managers.  It is undisputed that Patrick Caserta, who stopped including White in the Voluntary Protection Program in 2015, did not supervise White and was not involved in Velasquez's decision to fire her in 2016.  (Docket Entry No. 11 at ¶ 17; Docket Entry No. 43-1 at ¶ 19).

---

[4] The continuing-violation case law White cites is not persuasive because most predates *Morgan*, and the one case from after *Morgan*—*Ryals v. Am. Airlines, Inc.*, 553 F. App'x 402, 405 (5th Cir. 2014)—does not address whether the continuing-violation doctrine applies beyond hostile work environment claims.  (*See* Docket Entry No. 45 at 18–20 (citing mostly pre-2002 cases)).

White's conclusory allegation of an "organized scheme" is not enough to create a factual dispute material to deciding that the two adverse actions were not so closely related to be a continuing violation.  Nor can she avoid summary judgment by pointing to her many other complaints that do not rise to the level of an adverse employment action.  Aside from her removal from the Voluntary Protection Program, none of White's other allegations involves Patrick Caserta.

As to the Title VII, ADA, and ADEA claims, only the May 2016 termination—the only adverse employment action alleged within the limitations period—provides a timely basis for recovery.  The evidence of earlier acts may be relevant as evidence supporting the claim based on the May 2016 firing.

### 2.       The § 1981 Race Discrimination Claim

Section 1981 race-discrimination claims are not subject to the same administrative exhaustion requirements as Title VII, the ADA, and the ADEA.  A four-year statute of limitations applies to § 1981 violations of that arise after an employment contract begins, including claims for wrongful termination or other postcontract conduct of the employer.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).  The court will consider alleged § 1981 violations arising on or after January 17, 2015, four years before this lawsuit, including White's April 2015 removal from the Voluntary Protection Program.

### C.       White's Discrimination Claims

White alleges race, sex, age, and disability discrimination in violation of Title VII, § 1981, the ADEA, and the ADA.  Because White does not provide direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework for circumstantial evidence applies.

23

First, White must make a *prima facie* showing of discrimination.  The parties agree that White belonged to protected groups, that she was qualified for her position, and that her termination was an adverse employment action.  (Docket Entry No. 43 at 24; Docket Entry No. 45 at 20–21); *see Burlington N.*, 548 U.S. at 68 (termination is an adverse employment action).  The parties dispute whether removing White from the Volunteer Protection Program was an adverse employment action and whether CPChem treated similarly situated employees outside the protected classes more favorably than White.

### 1.    Whether Removing White from the Volunteer Protection Program Was an Adverse Employment Action

White argues that her removal from the Volunteer Protection Program was an adverse employment action because the Program provided bonuses, money, and gifts.  (Docket Entry No. 45 at 21; *see* Docket Entry No. 45-12, White Dep. at 183:17–19).  Citing district court and out-of-circuit authority, CPChem responds that because White's removal from the Program did not affect her salary, job title, or responsibilities, it was not an adverse employment action.  (Docket Entry No. 43 at 25; Docket Entry No. 47 at 6–7).  CPChem also emphasizes that participation in the Program was voluntary and that White received salary increases after leaving it.  (Docket Entry No. 47 at 6–7).

The Fifth Circuit has not squarely addressed whether losing a bonus is an adverse employment action.  *See Murray v. La.-Div. of Admin. Office of Planning & Budget*, 439 F. App'x 349, 351 n.2 (5th Cir. 2011) (in the retaliation context, "it is less clear whether . . . the denial of a bonus constitute[s an] actionable adverse employment action[]. . . . we decline to answer th[at] question[] here").  The court assumes, without deciding, that the loss of Program membership, and the corresponding monetary compensation, was an adverse employment action.  *See Mitchell*, 326 F. App'x at 854 (adverse employment actions include compensation decisions (citing *McCoy*, 492

F.3d at 559)).  For the reasons explained below, White's discrimination claims fail whether or not removal from the Program was an adverse employment action.

### 2.     Whether CPChem Treated Similarly Situated Employees Outside of White's Protected Classes Better than White

White must show that CPChem treated similarly situated employees more favorably in "nearly identical circumstances."  *Okoye*, 245 F.3d at 512–13 (5th Cir. 2001).  White compares herself first to Bubba MacArthur, who she describes as an able-bodied white man who was under 40 and who White alleges was also a materials coordinator.[5]  (Docket Entry No. 45 at 9, 22 (citing Docket Entry No. 45-12, White Dep. at 86:11–25; 87:1–9)).

White asserts that, although she and MacArthur had the same supervisor and position, MacArthur received a higher salary, and CPChem did not investigate White's complaint that MacArthur disrespected her.  (Docket Entry No. 45 at 22).  White cites no evidence supporting these allegations, other than the complaint she emailed to her supervisor and her conclusory statements in her affidavit.  *See* (Docket Entry No. 45-2); *Burch v. City of Nacogdoches*, 174 F.3d 615, 622 n.11 (5th Cir. 1999) ("Construing the facts in the light most favorable to [the nonmoving party] does not require [the court] to credit otherwise unsupported assertions."); *Cole v. Frank's Casing Crew & Rental Tools, Inc.*, No. H-04-2566, 2005 U.S. Dist. LEXIS 50224, 2005 WL 2647966, at *5 (S.D. Tex. Oct. 17, 2005) (striking the plaintiff's testimony about her alleged comparator from the summary judgment record because the plaintiff "did not make personnel decisions and was not in a position to know about the basis for those decisions").

---

[5] CPChem disputes that MacArthur and White had the same jobs, citing what it describes as White's conflicting statements in her deposition.  (Docket Entry No. 47 at 8 n.5).  The court interprets White's testimony in the light most favorable to her at the summary judgment stage.  White also cites an internal organizational chart listing "A. T. White" and "D. G. McCarther" as "Materials Coordinators."  (Docket Entry No. 45-2 at 4).

As explained in connection with the analysis of the motion to strike, the court does not consider White's allegation that her supervisor failed to investigate MacArthur's alleged disrespectful comments towards White. CPChem's alleged failure to investigate White's complaint against McArthur concerned a complaint from 2012—years before the adverse employment actions against White in 2015 and 2016. (Docket Entry No. 45-2). In her deposition, White admitted that her supervisor did not tell her McArthur's salary and simply said that employees from "the area that [McArthur] came from" in the company "tend to make more money." (Docket Entry No. 45-12, White Dep. at 87:15–19). Nor does White identify evidence establishing MacArthur's age, disability status, or disciplinary history. *See Heggemeier*, 826 F.3d at 868. The comparison to MacArthur does not help White make a *prima facie* showing of discrimination.

White also compares herself to unspecified members of the Volunteer Protection Program, none of whom were African-American. CPChem employee Patrick Caserta told White that he removed her from the program because she missed a "Mock Audit" in February 2015. (Docket Entry No. 45-10 at 2). White alleges that other team members did not lose their positions in the Program even though they, like her, had missed the meeting. (Docket Entry No. 45-1 at ¶ 6; Docket Entry No. 45-10 at 2).

White's comparison to other Program members does not make a *prima facie* showing under § 1981, for three reasons. First, White does not personally know whether other members attended the February 2015 meeting, and she cites no record evidence aside from her affidavit.[6] The court need not credit her unsupported assertion. *See Burch*, 174 F.3d at 622 n.11. Second, White does not identify information showing that other, unspecified Program members had comparable

---

[6] White's brief also cites page 184 of her deposition transcript, but that page does not appear in the record.

disciplinary histories or meeting attendance records.  *See Heggemeier*, 826 F.3d at 868.  Third, White's own affidavit undermines her attempt to use this comparison to support a *prima facie* showing of discrimination.  White accused CPChem of removing her from the Program in retaliation for filing her March 2015 EEOC complaint, not because of her membership in a protected class.  (Docket Entry No. 45 at 8–9).

White's discrimination claims fail at the first step.  The court need not reach the next steps of the *McDonnell Douglas* analysis.  Even if White succeeded at the first step, CPChem has proffered legitimate reasons for its adverse employment actions.  CPChem explains that Patrick Caserta removed White from the Volunteer Protection Program because her absences from meetings showed that she was too busy to participate.  (Docket Entry No. 43 at 15, 17; Docket Entry No. 43-11 at 2–3; Docket Entry No. 43-17, White Dep. at 91:4–92:4; Docket Entry No. 43-23).  White testified that before Caserta took her out of the Program, she had no problems with him.  (Docket Entry No. 43-17, White Dep. at 114:16–18).  White's only evidence of pretext is that the removal happened the month after she filed her March 2015 EEOC complaint.  (Docket Entry No. 45 at 27).  This argument goes to White's retaliation claims rather than her discrimination claims.  In addition, temporal proximity is not enough to avoid summary judgment at the pretext stage.  *Musser v. Paul Quinn College*, 944 F.3d 557, 564 (5th Cir. 2019) ("[T]emporal proximity alone is insufficient' to survive summary judgment at the pretext stage in the absence of 'other significant evidence of pretext." (quoting *Solvay Pharm.*, 871 F.3d at 334)).  Again, though she alleges that she "was  not the only person to miss a [Volunteer Protection Program] meeting," White does not offer specific evidence of other Program members having similar numbers of absences.  (*See* Docket Entry No. 45-1 at ¶ 6).

As for the firing, CPChem states that it fired White because—after admitting to sexually harassing a contractor employee in December 2014—she "violated [Velasquez's] directive, disclosed confidential information to Villalpando, lied about her actions, and harassed Villalpando." (Docket Entry No. 43-1 at ¶ 17; Docket Entry No. 43-18 at ¶ 11). Below, under the retaliation claims, the court explains White's failure to point to evidence raising a factual dispute material to determining CPChem's grounds for termination were pretextual. The record supports no such inference.

### 3.    White's Failure-to-Accommodate Claim under the ADA

To proceed on her claim that CPChem failed to accommodate her disability under the ADA, White must point to summary judgment evidence that (1) she was a qualified individual with a disability, (2) CPChem was aware of White's disability and its resulting limitations; and (3) CPChem failed to reasonably accommodate her disability. *Neely*, 735 F.3d at 247. In her brief, White argues that CPChem "was hesitant in granting her a reasonable accommodation" but "eventually" provided "another contractor" to assist her. (Docket Entry No. 45 at 11, 25). White testified that CPChem did not provide assistance at first, but "[t]hey worked on it and eventually [she] got help." (Docket Entry No. 45-12, White Dep. at 37:9–20).

CPChem points to White's testimony that she did not ask for an accommodation for a disability other than additional physical assistance in 2012. (Docket Entry No. 43-17, White Dep. at 37:13–38:14). In response to that request, CPChem assigned a contractor employee to help White with various tasks. (*Id.*). White's own testimony shows that CPChem accommodated her and she asked for no additional assistance. (*Id.*). Because White has not raised a factual request dispute material to finding that CPChem's steps to accommodate White's disability met the statutory requirement, her second ADA claim does not survive summary judgment.

D.     **White's Retaliation Claims under Title VII, the ADEA, the ADA, and the FMLA**

White brought retaliation claims under Title VII, the ADEA, the ADA, and the FMLA—not § 1981.  (Docket Entry No. 11 at ¶¶ 44–70).  Because White does not rely on direct evidence of retaliation, the court applies the *McDonnell Douglas* burden-shifting framework.

1.     **Whether White Made a *Prima Facie* Case of Retaliation**

a.     **The Protected Activity**

CPChem does not dispute that White engaged in protected activity under Title VII, the ADA, and the FMLA. Filing complaints with the company's human resources department, filing EEOC charges, and making FMLA leave requests are protected activities.  *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 682–83 (5th Cir. 2017) (human resources complaints); *Mauder v. Metro. Transit Auth. of Harris Cty.*, 446 F.3d 574, 580 (5th Cir. 2006) (FMLA requests); *Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 339 (5th Cir. 1999) (EEOC charges).

CPChem argues that White did not engage in protected activity under the ADEA.  (Docket Entry No. 43 at 30–31).  In unpublished but persuasive decisions, the Fifth Circuit held that a complaint is not a protected activity when the complaint fails to connect the challenged employment practice to the complainant's protected class.  *See Gordon v. Acosta Sales & Mktg.*, 622 F. App'x 426, 431 (5th Cir. 2015) ("[W]hen employees make complaints about harassment without connecting the employment practices to their disabilities, these complaints do not constitute protected activity [under the ADA]."); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (affirming a summary judgment ruling because the "Appellant does not allege that she specifically complained of racial or sexual harassment, only harassment").  White's 2015 EEOC charge does not mention age-related discrimination, (Docket Entry No. 43-20), and White does not identify evidence suggesting that she expressed age-

29

discrimination concerns in her complaints to human resources.  Because White has not raised a material factual dispute as to whether she engaged in a protected activity under the ADEA, the ADEA retaliation claim does not survive summary judgment.

The court turns to the Title VII, ADA, and FMLA retaliation claims.

### b.    The Adverse Employment Action

As stated above, White's termination was an adverse employment action.  *See Burlington N.*, 548 U.S. at 68.  The court does not consider White's removal from the Volunteer Protection Program as a separate basis for White's retaliation claims because, as explained above, the removal was more than 300 days before she filed her 2017 EEOC complaint asserting the retaliation claims. White's complaint does not include a retaliation claim under § 1981, so she cannot take advantage of its longer statute of limitations.  (See Docket Entry No. 11).

### c.    The Causal Link Between the Protected Activity and the Adverse Action

White asserts that CPChem terminated her employment in retaliation "for her numerous complaints of discrimination made to management and to Human Resources—the last of which occurred shortly before her termination on May 6, 2016."  (*Id.* at ¶ 15).  The record shows that White's last complaint to human resources was on January 21, 2016, almost five months before her termination.  (*Id.* at ¶ 30; Docket Entry 43 at 32; Docket Entry 43-11).  White also alleges that her firing was in retaliation for filing a FMLA leave request, which she had done 11 days earlier. (Docket Entry No. 11 at ¶ 69; Docket Entry No. 45-6).  White argues that Velasquez, the supervisor who fired her, must have known about her FMLA request because he was listed as a coinvestigator on a human-resources department report that mentioned her request.  (Docket Entry No. 43-13 at 2, 10).

CPChem contends that, even considering temporal proximity, the time between White's complaints and the alleged retaliation is not close enough" to support an inference of retaliation. (Docket Entry No. 43 at 32–33).  The company cites *Myers v. Crestone Int'l., L.L.C.*, a Fifth Circuit case in which a three-month lapse between a protected activity and an alleged retaliatory act was insufficient to support a causation inference.  121 F. App'x 25, 29 (5th Cir. 2005); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quotation omitted) (when "mere temporal proximity" is the only evidence of causality, proximity must be very close).

"'Close timing between an employee's protected activity and an adverse action against [her] may provide the "causal connection" required' to make out a *prima facie* case of retaliation." *See Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).  The court finds that White's May 2016 termination and her April 2016 FMLA request were close enough in time to support a *prima facie* showing of FMLA retaliation.

For the sake of a complete *McDonnell Douglas* analysis, the court assumes, without deciding, that the other retaliation claims cross the *prima facie* threshold as well, even though White filed the other complaints approximately four and a half months before her firing.  *Cf. Richard v. Cingular Wireless, L.L.C.*, 233 F. App'x. 334, 338 n.2 (5th Cir. 2007) ("[T]he Supreme Court has acknowledged other circuit court decisions that found three and four month periods too long to allow for an inference of causation." (citation omitted)); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (finding that a five-month gap alone is insufficient to show causation).  White might argue that Velasquez's alleged slights towards her starting in September 2015 show "a chronology of events from which retaliation may plausibly be inferred."  *Benfield*, 945 F.3d at 338 (quoting *Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997)).

As explained below, whether the court analyzes this argument at the *prima facie* stage or the pretext stage, it fails to avoid summary judgment.

### 2.    Whether CPChem Stated a Legitimate Reason for Firing White

CPChem meets its burden to produce a legitimate, nonretaliatory ground for firing White. CPChem found that in April 2016, White—who had already admitted to sexually harassing a contractor employee in December 2014—"violated [Velasquez's] directive, disclosed confidential information to Villalpando, lied about her actions, and harassed Villalpando." (Docket Entry No. 43-1 at ¶ 17; Docket Entry No. 43-18 at ¶ 11). The burden shifts back to White.

### 3.    Whether There is a Factual Dispute Material to Pretext

"[O]nce the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Swanson*, 110 F.3d at 1188; *see also Musser*, 944 F.3d at 564 ("[T]emporal proximity alone is insufficient' to survive summary judgment at the pretext stage in the absence of 'other significant evidence of pretext." (quoting *Solvay Pharm.*, 871 F.3d at 334)).

White argues that CPChem's justification was pretextual because, under company policy, CPChem should have downgraded the 2014 final written warning White received in December 2015, one year after CPChem concluded the sexual-harassment investigation. (Docket Entry No. 45 at 10–11). In other words, White argues that if CPChem had downgraded the earlier warning, it would not have fired her after the April 2016 investigation.

CPChem responds persuasively that it did not violate its policy, which states that the disciplinary process "typically involves 4 levels of discipline," "not necessarily in sequential order," and that "levels may be skipped." (Docket Entry No. 47 at 10 (quoting Docket Entry No.

43-7 at 3)).  The policy also states that the rules "shall not limit management in its prerogative to maintain discipline and to apply disciplinary action for misconduct that is properly and customarily the subject of disciplinary action."  (Docket Entry No. 43-7 at 3).  When a "policy clearly states that following the steps is not mandatory and that managers maintain significant discretion in determining how to discipline employees," skipping levels of discipline is not evidence of pretext. *Taylor v. Peerless Indus., Inc.*, 322 F. App'x 355, 367 (5th Cir. 2009).

White contends that the April 2016 investigation that resulted in her termination relied on "assumptions" rather than "hard evidence," and White also argues that she did not have a fair chance to defend herself.  (Docket Entry No. 45 at 15–16).  In a footnote, White observes that the separation paperwork stated that she had retired voluntarily, arguing that the inconsistency undermines the company's stated ground for firing her.  (*Id.* at 16 n.16).[7]  Finally, as discussed above, White contends that Velasquez had been looking for ways to fire her since September 2015.

Whether viewed individually or in combination, these arguments fail to create a material factual dispute as to pretext.  "Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones."  *LeMaire*, 480 F.3d at 391.  The plaintiff "must do more than just dispute the underlying facts and argue that [the employer] made the wrong decision in order to survive summary judgment."  *Id.*; *see also Hervey v. Miss. Dep't of Educ.*, 404 F. App'x

---

[7] White also claims that a "TWC Appeal Tribunal" found that "(a) [CPChem] only provided secondhand, hearsay testimony that [White] told one of the contractors that [the contractor's] job could be in jeopardy; (b) [White] did not disclose any confidential information regarding contractor staffing; and (d) [*sic*] [White's] discharge was not for work-connected misconduct based on Defendant's company policy." (Docket Entry No. 45 at 24).  Because White's only support for this assertion is a cited exhibit that the court cannot locate in the record, the court does not consider this argument.  Even if this evidence was properly before the court, it would not affect the outcome.  See *Williams v. Aviall Servs., Inc.*, 76 F. App'x 534, 536 (5th Cir. 2003) (citation omitted) ("[T]he Texas Workforce Commission's findings and conclusions may not be used as evidence in lawsuits, except for suits brought to enforce unemployment benefits."); *Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 865 (S.D. Tex. 2007) (TWC Appeal Tribunal findings cannot be introduced in lawsuits other than for unemployment benefits).

865, 870 (5th Cir. 2010) ("[The plaintiff] cannot defeat summary judgment based on her contention that [the employer] incorrectly perceived her performance concerning an inappropriate student/teacher relationship, teacher evaluations, and racial tension on campus.").

White has done little more than question the April 2016 investigation's factual conclusions. Her own evidence shows that CPChem's separation form contained the "voluntary retirement" code so that CPChem could pay her a retirement benefit for 2016, despite her termination. (Docket Entry No. 45-9 at 4–7 (internal emails discussing the use of the voluntary retirement code even though White was fired)). And, as noted above, despite her problems with Velasquez, White admitted that he did not reprimand her and she could not recall that he prevented her from performing her duties. (Docket Entry No. 43-17, White Dep. at 103:5–21; Docket Entry No. 45-12, White Dep. at 102:14–20, 149:10–15). White's speculation that Velasquez wanted to retaliate against her is not enough to avoid summary judgment  *See Burch*, 174 F.3d at 622 n.11 ("Construing the facts in the light most favorable to [the nonmoving party] does not require [the court] to credit otherwise unsupported assertions."); *Swanson*, 110 F.3d at 1188 ("[T]he plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive.").

## IV. Conclusion

CPChem's motion to strike, (Docket Entry No. 46), is granted in part and denied in part. CPChem's motion for summary judgment, (Docket Entry No. 43), is granted. Final judgment is entered by separate order.

SIGNED on July 30, 2020, at Houston, Texas.

_Lee H. Rosenthal_
_____

Lee H. Rosenthal
Chief United States District Judge

34